IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Paul Shimelonis,                              Case No. 3:17 CV 2681

          Plaintiff,             MEMORANDUM OPINION
                                                 AND ORDER

      -vs-
                                                       JUDGE JACK ZOUHARY

Andrew Eddy, et al.,

          Defendants.

## INTRODUCTION

Plaintiff Paul Shimelonis brings this action under 28 U.S.C. § 1983, alleging Defendants Dr. Andrew Eddy, Dr. Inam Khan, and Nurse Tara Bisang violated his Eighth Amendment rights by failing to provide timely and appropriate medical care for his psoriasis and folliculitis. Defendants move to dismiss the Amended Complaint (Doc. 10) as untimely and for failure to state a claim (Doc. 16); Shimelonis opposes (Doc. 17).

## BACKGROUND

Shimelonis has been incarcerated at Marion Correctional Institute (MCI) since December 2012 (Doc. 10 at ¶¶ 2, 21). Dr. Eddy is employed by the Ohio Department of Rehabilitation and Correction as the State Medical Director, "responsible for the oversight and coordination of the delivery of health care services to all inmates incarcerated in Ohio's prisons" (*id.* at ¶ 4). Dr. Khan is the Chief Medical Officer at MCI. As Chief Medical Officer, Dr. Khan is "the ultimate medical authority at MCI" and is responsible for evaluating inmates for "referral consultation" and "participat[ing] in the collegiate review process" (*id.* at ¶ 5; *see also id.* at ¶¶ 22–24). During the

collegiate review process, consult requests are "presented and discussed" with "[Bureau of Medical Services] staff who either approve . . . or deny the [requests]" (*id.* at ¶ 28).

Nurse Bisang is the current Health Care Administrator at MCI, "responsible for the daily administration of health care" to prisoners (*id.* at ¶ 7). Nurse Bisang became the Health Care Administrator sometime between May 2014 and March 2016.

**Events before December 22, 2015**

Prior to his incarceration, Shimelonis was diagnosed with psoriasis, which was "being treated and controlled by a dermatologist" (*id.* at ¶ 16). Shimelonis does not disclose what the treatment plan entailed or allege that it was ever disclosed to Defendants. While incarcerated at Lorain Correctional Institute (LCI) in October/November 2012, Shimelonis was diagnosed with folliculitis (*id.* at ¶¶ 17–18). LCI medical staff prescribed Bactrim and Clindamycin (antibiotics) to treat Shimelonis' folliculitis, and Clobetasol and Medrol to treat his psoriasis (*id.* at ¶¶ 19–20). Shimelonis alleges all of these medications were ineffective.

Shimelonis was then transferred to MCI in December 2012 (*id.* at ¶ 21). In January 2013, a doctor requested Methotrexate (a chemotherapy and immunosuppressant) to treat his psoriasis (*id.*). The doctor also submitted a consult request for Shimelonis to be referred to an offsite dermatologist "ASAP" (*id.*). About three weeks later, Dr. Eddy denied the consult request (*id.* at ¶¶ 21, 25). Instead, he provided an alternative plan of care (APOC) directing Shimelonis to continue taking Methotrexate and MCI medical staff to monitor his condition. "Upon information and belief," Shimelonis "was not receiving Methotrexate as prescribed" (*id.* at ¶ 25).

In November 2013, a certified nurse practitioner submitted another consult request for an offsite dermatologist, but the consult request was "delayed by Dr. Eddy" (*id.* at ¶¶ 27, 29). Instead, Dr. Eddy recommended an APOC "includ[ing] a biopsy to determine the cause of [Shimelonis']

2

[f]olliculitis, and possible UV light therapy in the future" (*id.* at ¶ 29). The November 2013 consult request was delayed through mid-December 2013 in anticipation of the biopsy (*id.* at ¶¶ 30–31). Once the biopsy was performed, the consult request was again delayed in anticipation of the results (*id.* at ¶¶ 32–33). The results came on January 16, 2014 and "revealed no identifiable bacteria" (*id.* at ¶ 34). That same day, Dr. Eddy denied the November 2013 consult request (*id.*). "Upon information and belief, no reasons were given for the denial and no [APOC] was provided" (*id.*).

In April 2014, an MCI doctor submitted another consult request. At this point, Shimelonis had been prescribed Clindamycin, Bactrim, Erythromycin, Gentamicin, and Ciprofloxacin (antibiotics) for his folliculitis and Methotrexate for his psoriasis, but all of these medications were "ineffective" and his "symptoms continued to worsen and spread" (*id.* at ¶ 35). A week later, Dr. Eddy delayed the consult request until the MCI doctor could determine what percentage of Shimelonis' body was affected (*id.* at ¶ 36). The MCI doctor reported that 36% of Shimelonis' body was covered in lesions. "Upon information and belief," Dr. Eddy then denied the April 2014 consult request (*id.* at ¶ 37). The Amended Complaint does not indicate whether a reason or APOC was provided.

A month later, the MCI doctor submitted a second consult request. The doctor noted that Shimelonis was "using 5 tubes of Clobetasol each month and approximately 36% of [his] body was covered with lesions" (*id.* at ¶ 38). "[W]hile not wholly effective," Clobetasol did "alleviate some of [Shimelonis' psoriasis] symptoms" (*id.*). The next day, Dr. Eddy delayed the consult request "to verify that [Shimelonis] was taking his medication" (*id.* at ¶ 39). Medical records confirmed he was (*id.*). The consult request was resubmitted a week later, but was denied. Instead, Dr. Eddy recommended an APOC, including light therapy (*id.* at ¶ 40). "Upon information and belief," the necessary UV light was "never acquired" (*id.* at ¶¶ 40–42).

3

In July 2014, the MCI doctor submitted a third consult request. Shimelonis "presented with worsening skin lesions . . . that were not healing" and were now covering over 40% of his body (*id.* at ¶ 45). Dr. Eddy denied the request ten days later and ordered an APOC of psoralen and UV light (*id.* at ¶ 46). Psoralen is "used to make the skin more sensitive to [UV]" (*id.*). But, as discussed, no "UV light had been procured" (*id.*).

The Amended Complaint reports no activity between mid-July 2014 and mid-February 2015. The MCI doctor then submitted a fourth consult request, which Dr. Eddy denied (*id.* at ¶ 47). Instead, he provided an APOC allowing Shimelonis to consult with doctors at Warren Correctional Institute "to determine which UV light to purchase" (*id.*).

In April 2015, a second biopsy was performed. The biopsy revealed that the cause of Shimelonis' folliculitis "may be fungal due to the presence of yeast" (*id.* at ¶ 50).

In May 2015, Shimelonis was alerted that Dr. Eddy had removed Clobetasol from the medication formulary (*id.* at ¶ 51). Shimelonis was sent to Doctor Sick Call for alternative medications (*id.*).

**Events after December 22, 2015**

Sometime between May 2015 and March 2016, Dr. Eddy denied an order for "an oral anti-fungal medication" to treat Shimelonis' folliculitis -- he instead prescribed "an anti-fungal cream" (*id.* at ¶ 53). In March 2016, Shimelonis alerted Nurse Bisang that the anti-fungal cream was not working and requested the previously denied oral anti-fungal medication (*id.*). Nurse Bisang informed him that he "must see an ALP [Advanced Level Provider] for evaluation of his treatment plan" (*id.*). The Amended Complaint does not suggest Shimelonis ever pursued the evaluation, but alleges he "was never provided with an effective anti-fungal medication" (*id.*).

4

In June 2016, Shimelonis was prescribed "Methotrexate in intramuscular injection" form (*id.* at ¶ 55). Shimelonis was already taking an oral version of Methotrexate at the time, but at a dosage "too low to effectively treat his symptoms" (*id.*). A day later, Shimelonis filed an informal complaint alleging he had not received any psoriasis medication in two weeks (*id.* at ¶ 56). Nurse Bisang advised Shimelonis that Dr. Eddy "had stopped the oral Methotrexate and prescribed the injection" (*id.*). Shimelonis alleges that he "was to continue the oral dose until the injection became available," but also alleges that the "oral [M]ethotrexate was discontinued in anticipation of the injectable version" (*id.* at ¶¶ 56, 58).

At some unidentified point, Shimelonis also requested to continue with Clobetasol, the medication Dr. Eddy removed from the medication formulary in May 2015. Dr. Eddy denied the requests because Clobetasol "was no longer on the [f]ormulary" (*id.* at ¶ 57). He instead instructed Nurse Bisang to take pictures of Shimelonis "to document changes in [his] [p]soriasis without using the Clobetasol" (*id.*).

For an unidentified period of time, Shimelonis contends he did not "receiv[e] any medication for his [p]sorasis" while he awaited the injectable Methotrexate (*id.* at ¶ 58). "Due to the changes and delays in medications," he alleges his psoriasis worsened and his folliculitis "remained untreated as none of the medications provided were effective" (*id.* at ¶ 59).

In March 2017, Shimelonis notified Nurse Bisang that he was out of folic acid, "a supplement taken as part of his treatment for [p]soriasis" (*id.* at ¶ 60). Nurse Bisang assured him "that she would order it" (*id.*). Four days later, a certified nurse practitioner assured Shimelonis that the medication "would be re-ordered" in Nurse Bisang's presence (*id.*). Shimelonis received the folic acid about one month after he first notified Nurse Bisang he needed a refill (*id.*).

Dr. Khan was "personally involved" in Shimelonis' treatment "on at least one occasion" (*id.* at ¶ 68). Around May 2017, Dr. Khan "refused [Shimelonis] timely and appropriate medical treatment because [he] was to be released soon" (*id.*). Shimelonis does not indicate what treatment he sought, or whether it related to one or both of his skin conditions. But he contends Dr. Khan asked him when he would be released, and then told him he "could get real medical treatment" after his release in nineteen months (*id.* at ¶ 69). When interviewed by the Institutional Inspector, Dr. Khan reported he advised Shimelonis that "ODRC is required to treat the symptoms of the illnesses while men are incarcerated, they are not required to cure the illness" (*id.*).

### STANDARD OF REVIEW

An action may be dismissed if the complaint fails to state a claim upon which relief may be granted. Federal Civil Rule 12(b)(6). At this stage, this Court must accept all well-pled factual allegations as true and construe the Complaint in the light most favorable to Shimelonis. *Haviland v. Metro. Life Ins. Co.*, 730 F.3d 563, 566–67 (6th Cir. 2013). Although the Complaint need not contain "detailed factual allegations," it requires more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the Complaint will survive the Motion to Dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (citing cases).

## DISCUSSION

**Statute of Limitations**

Generally, a motion to dismiss is an "inappropriate vehicle" to dismiss a claim on statute of limitations grounds. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). But dismissal is appropriate if "the allegations in the complaint affirmatively show that the claim is time-barred." *Id.*

In Ohio, the statute of limitations for a Section 1983 action is two years. *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc). The limitations period accrues when the plaintiff knew or had reason to know of the injury forming the basis of the action. *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009). In a deliberate indifference action, accrual is based not on the discovery of medical *problems*, but on the discovery of *indifference* to serious medical needs. *See id.* at 646–47.

Shimelonis filed this action on December 22, 2017 (Doc. 1). Defendants therefore contend all claims preceding December 22, 2015 are untimely. Shimelonis argues the continuing violation doctrine applies because "it would *not* have been plainly apparent that every act of the Defendants constituted an actionable event" and "it would be unreasonable to expect [him] to file a lawsuit over every incident of the Defendants [sic] unlawful conduct" (Doc. 17 at 12).

When it applies, the continuing violation doctrine allows a court to "consider as timely all relevant violations including those that would otherwise be time[-]barred." *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 416 (6th Cir. 2007) (alteration in original) (quotation marks and citation omitted). The doctrine "rarely extends to . . . § 1983 actions," *Sharpe v. Cuereton*, 319 F.3d 259, 267 (6th Cir. 2003), and does not apply to serial violations -- "a series of *discrete* acts, each of which the plaintiff would have been immediately aware." *North v. Cuyahoga County*, 2015

7

WL 5522009, at *3 (N.D. Ohio 2015) (emphasis added) (citing *Sharpe*, 319 F.3d at 268). "[P]assive inaction does not support a continuing violation theory." *Bruce v. Corr. Med. Servs., Inc.*, 389 F. App'x 462, 466 (6th Cir. 2010) (citation omitted).

Although perhaps related to the same conditions, the "[a]ctual actions by [Defendants] of refusing [or delaying] medical care represent discrete unlawful acts" of which Shimelonis was immediately aware or could have been aware with the exercise of reasonable diligence. *See id.* at 466–67. *See also Sharpe*, 319 F.3d at 266. Although the circumstances in this case are not identical to those alleged in *Bruce* or *North*, they are analogous. Further, Shimelonis cites no binding precedent extending the continuing violation doctrine to claims of deliberate indifference. This Court finds no reason to do so here. All claims accruing before December 22, 2015 are, therefore, dismissed as untimely. This Court only considers these facts to the extent they provide context for later events.

**Deliberate Indifference to Serious Medical Need**

Shimelonis' claims under Section 1983 are based on alleged violations of the Eighth Amendment, which "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward [his] serious medical needs." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim has both an objective and subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The objective component requires Shimelonis to plead facts showing the existence of a "sufficiently serious" medical need. *Id.* (citation omitted). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Blackmore*, 390 F.3d at 897 (citation omitted). If the medical need is "less obvious, its seriousness is evaluated

8

by the effect of delay in treatment," *Blosser v. Gilbert*, 422 F. App'x 453, 460 (6th Cir. 2011), and the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay." *Blackmore*, 390 F.3d at 898.

When a prisoner has received some medical attention and the dispute is over the adequacy of that care, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Because Shimelonis received "on-going treatment for his condition" and alleges that the treatment was merely inadequate, he must show the treatment was either "so cursory as to amount to no treatment at all" or "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citations omitted). Essentially, he "must show that he is incarcerated under conditions posing a *substantial* risk of serious harm." *See Farmer*, 511 U.S. at 834 (emphasis added).

The subjective component requires Shimelonis to plead facts showing Defendants "kn[ew] of and disregard[ed] an excessive risk to [his] health or safety." *Farmer*, 511 U.S. at 837. Defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* "[A]llegations of medical malpractice or negligent diagnosis and treatment generally fail to state a [deliberate indifference] claim." *Broyles v. Corr. Med. Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. The subjective component is evaluated individually for each defendant. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

There is no dispute that Shimelonis suffers from psoriasis, "a chronic skin condition for which there is no cure," as well as folliculitis, "a skin infection . . . result[ing] in a rash and bleeding lesions" (Doc. 10 at ¶¶ 16–17). Nor do the parties dispute that Shimelonis received some treatment for these conditions. The gravamen of Shimelonis' complaints, therefore, concerns the adequacy of his treatment. Defendants contend Shimelonis received constitutionally adequate care and they did not possess the requisite mental state for Eighth Amendment liability. Shimelonis asserts that even though he was provided some treatment, that treatment was medically unacceptable or grossly inadequate. Further, he argues "it can reasonably be inferred from the face of the [] Amended Complaint that all the Defendants were deliberately indifferent to his serious medical needs" (Doc. 17 at 9).

### *Dr. Eddy*

The majority of Shimelonis' claims against Dr. Eddy are barred by the statute of limitations. The remaining claims concern his decisions to: (1) deny an order for an oral anti-fungal medication and instead prescribe an anti-fungal cream (*id.* at ¶ 53); (2) discontinue oral Methotrexate, which Shimelonis' alleges was ineffective, and instead prescribe an injectable form of Methotrexate (*id.* at ¶¶ 55–56), and (3) deny Shimelonis' request to continue with Clobetasol because it was no longer in the formulary, and instead have Nurse Bisang take pictures and "document changes in [his] [p]soriasis" (*id.* at ¶ 57).

Shimelonis' claims against Dr. Eddy amount to a disagreement with the chosen course of treatment. Allegations of failure to provide specific medications, treatment, or dosages typically do not state a claim of deliberate indifference to serious medical needs. *Mabry v. Antonini*, 289 F. App'x 895, 902 (6th Cir. 2008). *See also Rhinehart*, 894 F.3d at 744 ("A disagreement with a course of medical treatment does not rise to the level of a federal constitutional claim under the Eighth

10

Amendment."). Moreover, nothing in the Amended Complaint suggests Dr. Eddy had reason to believe the anti-fungal cream would be ineffective or less effective than the denied oral anti-fungal medication. Nor do any of the facts suggest Dr. Eddy had reason to believe the injectable Methotrexate would be ineffective or expose Shimelonis to a substantial risk of serious harm.

As for his "requests to continue Clobetasol," Shimelonis was first made aware that Dr. Eddy removed this medication from the formulary in May 2015, beyond the statute of limitations period (*see id.* at ¶¶ 51–52). It is unclear when Shimelonis made the requests or when they were denied. In any case, Shimelonis does not allege he ever told Dr. Eddy he believed Clobetasol was one of "the only medications to effectively relieve his [p]soriasis symptoms" (*id.* at ¶¶ 51–52, 57, 61). Further, Shimelonis admits he received *some* effective medications while at MCI -- including, but not limited to, Clobetasol. And although the Amended Complaint contains a detailed description of Shimelonis' symptoms up to July 7, 2014, it contains little to no information about his symptoms at the time his requests were made and denied. This Court agrees with Shimelonis that a chronic and non-lethal skin condition *can* present a serious medical need. But Shimelonis has failed to plead facts plausibly showing he suffered from an objectively serious medical condition, or a condition creating a substantial risk of serious harm, at the time Dr. Eddy denied the requests for Clobetasol. Absent allegations that Dr. Eddy was "aware of facts from which the inference could be drawn that a substantial risk of serious harm existed," and that he actually "dr[ew] the inference" but "fail[ed] to take reasonable measures to abate it," Shimelonis fails to state a claim of deliberate indifference. *Farmer*, 511 U.S. at 837, 847.

### *Nurse Bisang*

The only remaining claim against Nurse Bisang concerns a one-month delay in receiving folic acid (*see* Doc. 17 at 7–8). This claim fails for several reasons. First, Shimelonis fails to plead facts establishing he was suffering from an objectively serious medical need as he provides no description of his psoriasis symptoms during March 2017. Second, Shimelonis fails to plead facts suggesting the delay was detrimental. *See Blackmore*, 390 F.3d at 897–98. *See also Blosser*, 422 F. App'x at 460. Finally, the facts alleged do not show Nurse Bisang knew Shimelonis faced a substantial risk of serious harm if he was not provided folic acid and she disregarded that risk. Mere negligence, or "an inadvertent failure to provide adequate medical care[,] cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012) (citation omitted).

### *Dr. Khan*

Shimelonis claims against Dr. Khan relate primarily to his involvement in the collegiate review process and the repeated denial of consult requests. But these denials all occurred before December 22, 2015 -- the last on February 19, 2015. Any claim arising from the denials is, therefore, untimely. The only remaining claim against Dr. Khan involves the incident in May 2017 "wherein [he] refused [Shimelonis] timely and appropriate medical treatment because [he] was to be released" in nineteen months (Doc. 10 at ¶¶ 68–69). Shimelonis provides no information about the treatment he was receiving at the time, the symptoms he was experiencing, or the treatment he sought. Without more information, Shimelonis' claim against Dr. Khan fails to cross the line from possible to plausible.

**CONCLUSION**

The Motion to Dismiss (Doc. 16) is granted. To the extent the Amended Complaint raises a claim of negligence, this Court declines to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3).

IT IS SO ORDERED.

                                         s/ *Jack Zouhary*
                                       JACK ZOUHARY
                                       U. S. DISTRICT JUDGE

                                       August 31, 2018